# In the United States Court of Federal Claims

Nos. 19-1205, 19-1515 (consolidated)
Filed: February 20, 2020
Reissued: March 11, 2020[1]

| | |
|---|---|
| PAE-PARSONS GLOBAL LOGISTICS SERVICES, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant <br><br> and <br><br> FLUOR INTERCONTINENTAL, INC., <br><br> Defendant-Intervenor. | Post-Award Bid Protest; Judgment on the Administrative Record; RCFC 52.1; Motion to Dismiss; RCFC 12(b)(1); Tucker Act; Jurisdiction; Multiple Award Task Order Contract; Indefinite-Delivery Indefinite-Quantity Contract; Task Order Contract; Task Order; Federal Acquisition Streamlining Act; Administrative Procedure Act; Technical/Management Approach; Labor Staffing Model; Disparate Treatment. |
| PAE-PARSONS GLOBAL LOGISTICS SERVICES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant <br><br> and <br><br> VECTRUS SYSTEMS CORPORATION, <br><br> Defendant-Intervenor. | |

---

[1] An unredacted version of this opinion was issued under seal on February 20, 2020. The parties were given an opportunity to propose redactions, but no such proposals were made.

*Anuj Vohra*, Crowell & Moring LLP, Washington, DC, counsel for plaintiff.

*Robert Ralph Kiepura*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for defendant.

*Andrew Emil Shipley*, Wilmer Cutler, et al., LLP, Washington, DC, counsel for defendant-intervenor, Fluor Intercontinental.  *Kevin Mullen*, Morrison & Foerster, LLP, Washington, DC, counsel for defendant-intervenor, Vectrus Systems Corporation.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

      The central purpose of federal procurement law is to ensure that competition for government contracts, which are funded by tax payer dollars, is fair to both the government and to contractors.  Only when competition is fair and open can the government get what it pays for, and can the contractor receive fair value for the work and goods it provides.  If the system is not fair, the tax payer will be cheated, and honest contractors will be unwilling to contract with the government.  Accordingly, procurement law is designed to insure against corruption of the process, be it through bribery, government favoritism, or poor management of the procurement processes.  The law in turn provides disappointed bidders with an avenue through which they can challenge arbitrary and irrational government decisions, where disappointed bidders effectively act as "private attorney generals," keeping the system under perpetual scrutiny, ferreting out mistakes, and bringing to light bad government practices that impact their chances of receiving contract awards.  This the creates an effective system by which disappointed bidders keep in check the natural human tendency to award contracts based on favoritism.  So far, the system has worked rather effectively, though of course, any effectively run system has its associated costs.  Congress has, however, decided that the cost of expensive bid protest litigation is less than the cost of a corrupt or irrational decision-making process dealing with tens of billions of dollars.  As such, the Court must understand the broad purposes behind procurement law to effectively handle procurement cases.  The close scrutiny of disappointed bidders is balanced out by the deference afforded to Agencies.  We must remember that it is the agencies that have the authority, bestowed upon them by Congress and the President, to manage the procurement system.  The Court's role is to ensure fair and rational review by the agency in following the law in its decision-making processes.

      In this case, as well as the other cases related to Request for Proposal No. W52P1J-16-R-0001 ("RFP" or "Solicitation"), the six offerors spent many months and a large amount of money developing their proposals.  In general, the evaluation process worked well.  However, perhaps as a result of the inherent subjectivity and discretion in government contracting, a number of procurement ambiguities led to this extensive and expensive litigation.  The weight afforded by the United States Department of the Army ("Agency" or "Army") to

each of the four evaluation factors led to many of the alleged issues currently in dispute. The Solicitation prescribed the following evaluation factors, listed in descending order of priority: (1) Technical/Management Approach; (2) Past Performance; (3) Small Business Participation; and (4) Cost/Price. Administrative Record (hereinafter "AR") 2624. The ultimate award decisions confirm what the Solicitation stated—that the Technical/Management Approach was not just the most important factor, but that it was overwhelmingly more important than the other three factors. While the Agency's emphasis on the Technical/Management Approach was neither arbitrary nor capricious, the Court believes the uncertain level of priority afforded that factor played a significant role in each offeror's decision to litigate this procurement, as did, of course, the huge amount of money at stake.

A final point. This litigation involves contracts worth up to $82 billion for work to be performed over the next decade. While the Court detailed the reasons it has jurisdiction over these protests in *PAE-Parsons Global Logistics Services, LLC v. United States*, 145 Fed. Cl. 194 (2019), and in a later section of this Opinion, the Court finds that each of the protests related to this procurement concern disputes over the evaluation of offerors for the award of Indefinite-Delivery Indefinite-Quantity ("IDIQ") contracts, not disputes related to future task orders. To hold that this Court lacks jurisdiction over this massive IDIQ procurement would effectively gut a significant part of federal procurement law by using the Federal Acquisition Streamlining Act of 1994 ("FASA"), 10 U.S.C. § 2304c(e)(1) (2018), to nullify a broad area of contract scrutiny. This misuse of FASA would not streamline the procurement and protest process, but, rather, would eliminate a significant part of it, directly contradicting the legislative intent behind both FASA and the Competition in Contracting Act.

This post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, PAE-Parsons Global Logistics Services, LLC ("P2GLS"), challenges the decision of the Army to award IDIQ contracts to defendant-intervenors, Fluor Intercontinental, Inc. ("Fluor") and Vectrus Systems Corporation ("Vectrus"). *See generally* Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "Pl.'s MJAR").[2] Plaintiff asks the Court to determine the following: (1) "[w]hether the Army's evaluation was inconsistent with the RFP's express terms where the Army assigned elevated risk to P2GLS'[s] proposal despite assigning no weaknesses"; (2) "[w]hether the Army erred by treating its concern with P2GLS'[s] [Labor Staffing Model ("LSM")] as a *de facto* weakness that it failed to raise in discussions, rendering discussions misleading and not meaningful"; (3) "[w]hether the Army's criticism of P2GLS'[s] LSM was arbitrary and unsupported, and disparate as compared to the Army's treatment of Vectrus'[s] LSM"; (4) "[w]hether the [Source Selection Authority ("SSA")]'s AFRICOM and PACOM award decisions were arbitrary and capricious where [she] placed an inordinate amount of weight on offerors' LSMs while ignoring nearly every other evaluation factor, and in the case of AFRICOM, rejecting the [Source Selection Advisory Committee ("SSAC")]'s award recommendation without explanation." *Id.* at 4–5. For the reasons set forth below, plaintiff's Motion for

---

[2] As the cases have been consolidated, citations to filings on behalf of the parties or to the docket in this Opinion and Order refer to filings or docket entries under *PAE-Parsons Global Logistics Services, LLC v. United States*, No. 19-1205, unless the Court indicates otherwise.

Judgment on the Administrative Record is denied, and defendant and defendant-intervenors' Cross-Motions for Judgment on the Administrative Record are granted.

## I.   Background

### A. Solicitation

On November 20, 2017, the Army issued the Solicitation for the Logistics Civil Augmentation Program ("LOGCAP") V contract for logistics support services. Administrative Record (hereinafter "AR") 2510–11.[3] These support services include "supply operations, transportation services, engineering services, base camp services, and other logistics and sustainment support services." AR 130447. The Solicitation contemplated the award of four to six IDIQ contracts and associated task orders for LOGCAP V services covering the six Geographic Combatant Commands ("COCOMs") and Afghanistan. AR 2511–12. The Solicitation further separated the COCOMs into the following three "Operational Priority Groupings": (1) European Command ("EUCOM") and Pacific Command ("PACOM") regions; (2) Central Command ("CENTCOM"), Northern Command ("NORTHCOM"), African Command ("AFRICOM"), and Southern Command ("SOUTHCOM") regions; and (3) the Afghanistan region. AR 2511, 2624. Contracts and corresponding task orders would be awarded in descending order of priority according to which offeror was determined to provide the best value for a particular COCOM region, and an awardee could only receive one award in each Operational Priority Grouping. AR 2624–25. The Afghanistan task order could not be awarded independently, but instead was awarded as a task order to one of the LOGCAP V awardees that did not receive the CENTCOM award. *Id.*

The Solicitation provided that the regional task orders for each COCOM and Afghanistan were to be awarded simultaneously with the IDIQ contracts. AR 2511, 2624. The Solicitation further stipulated that the awards would be made on a best-value basis according to the following four factors, listed in descending order of importance: (1) Technical/Management; (2) Past Performance; (3) Small Business Participation; and (4) Cost/Price. AR 2624. Under the Technical/Management Factor, offerors were evaluated based on their respective "Regional Capabilities in Support of Setting and Surging the Theater and Initial Service Support of Army Deployment," and "Management Approach, Key Initiatives, and [LSM]." AR 2614–15.

---

[3]   The Administrative Record in Case No. 19-1205 was filed on October 2, 2019, and was limited to protest issues concerning the Agency's contract award to Fluor. *PAE-Parsons Glob. Logistics Servs., LLC v. United States*, No. 19-1205 (hereinafter "*PAE I*"). The Administrative Record in Case No. 19-1515 was filed on October 7, 2019, and was limited to protest issues related to the Agency's contract award to Vectrus. *PAE-Parsons Glob. Logistics Servs., LLC, v. United States*, No. 19-1515 (hereinafter "*PAE II*"). The Court consolidated both cases under Case No. 19-1205 on October 8, 2019. *See PAE I*, Order Consolidating Case, ECF No. 54. As the Court received both portions of the Administrative Record prior to its Orders consolidating these cases, citations to the Administrative Record in this Opinion are to the integrated and contiguous Administrative Records pulled from both cases, which mirror one another except for certain case-specific Administrative Record Tabs and page ranges.

For the Technical/Management Factor, offerors received separate adjectival ratings for each COCOM and Afghanistan based on LOGCAP risk areas, including responsiveness, affordability, transparency, predictability, capability, accountability, and flexibility. AR 2614. Relevant here, the Army outlined the requirements for an "Outstanding" or a "Good" adjectival rating. AR 2627. A proposal would be deemed "Outstanding" when it "indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low." *Id.* A proposal would be considered "Good" when it "indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate." *Id.*

While the Army did not officially issue independent risk ratings, it could consider the risk of unsuccessful performance when assigning adjectival ratings. *Id.* A "Low" risk of unsuccessful performance existed for proposals that "may contain weakness(es) which have little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties." *Id.* A "Moderate" risk of unsuccessful performance existed when a proposal "contains a significant weakness or combination of weaknesses which may potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties." *Id.*

The Army evaluated LSMs for "consistency, scalability, and adjustability" across the "broad range of requirements" of the LOGCAP V contracts and considered the "quality and soundness of the supporting rationale utilized to develop the [LSM]." AR 2627. The LSM served as a baseline proposal for the offeror's "labor staffing mix (supervision, skilled trade, laborer, etc.), types (job description, labor category, etc. [sic]), and quantities." AR 2616. Utilizing the LSM, offerors developed separate Labor Staffing Approaches, specific to the unique requirements of each COCOM and Afghanistan. *Id.* The Solicitation also required that offerors provide a Labor Staffing Model Supporting Rationale, which included the identification of the source of data, formulas, and reasoning behind any adjustments made to the proposed LSM. *Id.* The Solicitation mandated that justifications "should not be so general that it isnt [sic] possible to determine how the proposed types or quantities were developed" and required that, when resource estimates were based on past experience, offerors must identify those experiences and explain the formula for and rationale behind any adjustments. *Id.*

In evaluating Past Performance, the Agency analyzed an offeror's previous completion of projects with similar requirements to those of the LOGCAP V procurement. *Id.* Past Performance was rated adjectively, ranging from "Substantial Confidence" to "No Confidence." AR 2628. In analyzing Small Business Participation, the Army looked at the extent to which each proposal demonstrated a commitment to providing opportunities for small business involvement. *Id.* Offerors received one adjectival rating for their Past Performance Factor, and a single rating for their Small Business Participation. AR 2624. The Army would evaluate the Cost/Price Factor by analyzing each proposal's Cost-Plus-Fixed-Fee Contract Line Item Numbers ("CLINs") for reasonableness and realism and each proposal's Firm-Fixed Price CLINs for reasonableness. AR 2629. Each COCOM and Afghanistan received its own Cost/Price evaluation. *Id.*

5

### B. Evaluation

The Army evaluated the Technical/Management factor in accordance with Section M.8.4.a(i–ii) of the RFP. AR 2626–27. The Solicitation instructed each offeror to "describe its processes or procedures through the use of any tools, reports, communications, or other unique approaches in meeting LOGCAP objectives" in their LSM rationale. AR 2626. Further, the RFP noted that emphasis

> will be placed on [the] Offerors['] ability, based on the uniqueness of approach, to collect, package, and deliver actionable information to the Government, resulting in deliverables under this contract. The approach will be evaluated on how it addresses complexities of providing services during all phases: start-up operations; adjustment of services (i.e., adding/removing services, adding/removing workload); and drawdown of operations.

*Id.* The Army would also evaluate "the feasibility and confidence in the Offerors['] [LSM] and Approach." AR 2627. Moreover, "[t]he confidence evaluation will consider the quality and soundness of the supporting rationale utilized to develop the [LSM] and Approach." *Id.*

In its comparative analysis, the SSAC recommended P2GLS over Fluor for the AFRICOM award because the Agency determined P2GLS was less expensive, and because the SSAC found "P2GLS'[s] non-price proposal equalized with that of Fluor when considering P2GLS'[s] superior confidence rating in Past Performance and superior adjectival rating in Small-Business Participation compared to Fluor's superior adjectival rating [for its] Technical/Management [Approach]." AR 70477. Though the SSAC assigned Fluor's proposal strengths for its LSM, it determined that P2GLS's proposal did not contain the same strengths. AR 70476–77. The SSAC recommended Vectrus receive PACOM because its LSM contained a strength for its Final Proposal Revision ("FPR"), while P2GLS's FPR was absent that same strength. AR 70472–73.

The Agency assigned P2GLS and Fluor the following ratings for the AFRICOM region:

| AFRICOM | Technical/ Management | Past Performance | Small Business Participation | Total Evaluated Price |
|---|---|---|---|---|
| P2GLS | Good | Substantial | Outstanding | $126,507,558.85 |
| Fluor | Outstanding | Satisfactory | Good | $137,222,537.90 |

*See* AR 70627. For the PACOM region, the Agency assigned P2GLS and Vectrus the following ratings:

| PACOM | Technical/ Management | Past Performance | Small Business Participation | Total Evaluated Price |
|---|---|---|---|---|
| P2GLS | Good | Substantial | Outstanding | $304,425,024.86 |
| Vectrus | Outstanding | Substantial | Good | $349,187,574.26 |

6

*See* AR 70620.  Based on its best value analysis, on April 12, 2019, the Army awarded four IDIQ contracts, one each to KBR, Vectrus, Fluor, and P2GLS.  *See generally* AR 70776–82.  Of relevance, the Army awarded AFRICOM to Fluor and PACOM to Vectrus.  AR 70777 (PACOM), AR 70780 (AFRICOM).

### C.  Procedural History

On August 14, 2019, plaintiff filed its first Complaint with this Court, claiming that the Army improperly awarded Fluor the AFRICOM IDIQ contract.  *See generally* Plaintiff's Complaint (hereinafter "Compl."), *PAE-Parsons Glob. Logistics Servs., LLC v. United States*, No. 19-1205 (hereinafter "*PAE I*").  On August 21, 2019, defendant filed a motion to dismiss that Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  *See generally PAE I*, Defendant's Motion to Dismiss, ECF No. 31.  On September 24, 2019, the Court denied defendant's Motion to Dismiss.  *PAE-Parsons Glob. Logistics Servs., LLC v. United States*, 145 Fed. Cl. 194, 200 (2019).  On October 1, 2019, P2GLS filed a second complaint, alleging that the Army improperly awarded PACOM to Vectrus.  *See generally* Compl., *PAE-Parsons Glob. Logistics Servs. v. United States*, No. 19-1515 (hereinafter "*PAE II*").  On October 8, 2019, this Court ordered the consolidation of both cases due to the closely related nature of the issues.  *See PAE I*, Order Consolidating Case, ECF No. 54.

On October 17, 2019, plaintiff filed its Motion for Judgment on the Administrative Record.  *See generally* Pl.'s MJAR.  On October 29, 2019, defendant and defendant-intervenors filed their respective Cross-Motions for Judgment on the Administrative Record.  *See generally* Defendant's Partial Motion to Dismiss, Cross-Motion for Judgment upon the Administrative Record, and Opposition to Plaintiff's Motion for Judgment upon the Administrative Record (hereinafter "Def.'s CMJAR"); Vectrus Systems Corporation's Cross-Motion for Judgment on the Administrative Record; Fluor Intercontinental, Inc.'s Cross-Motion for Judgment on the Administrative Record and Response to P2GLS' Motion for Judgment on the Administrative Record (hereinafter "Fluor's CMJAR").  Plaintiff filed its Reply in Support of its Motion for Judgment on the Administrative Record and Response to defendant and defendant-intervenors' Cross-Motions for Judgment on the Administrative Record on November 4, 2019.  *See generally* Plaintiff's Reply in Support of Its Motion for Judgment on the Administrative Record and Response to Defendants' Cross-Motions for Judgment on the Administrative Record.  Defendant and defendant-intervenors filed their respective Replies in Support of their Cross-Motions for Judgment on the Administrative Record on November 8, 2019.  *See generally* Defendant's Reply in Support of Its Motion to Dismiss and Cross-Motion for Judgment upon the Administrative Record; Vectrus Systems Corporation's Reply in Support of Its Cross-Motion for Judgment on the Administrative Record; Fluor Intercontinental, Inc.'s Reply in Support of Cross-Motion for Judgment on the Administrative Record.  The Court held oral argument on November 13, 2019.  This case is fully briefed and ripe for review.

### II.  Standard of Review

This Court has jurisdiction over bid protests in accordance with the Tucker Act.  *See* 28 U.S.C. § 1491(b) (2018).  Specifically, this Court has the authority

to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.* This authority exists "without regard to whether suit is instituted before or after the contract is awarded." *Id.*

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment on the administrative record for the Court to determine whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review. RCFC 52.1; s*ee also Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006)). On a motion for judgment on the administrative record, the parties are limited to the Administrative Record, and the Court must make findings of fact as if it were conducting a trial on a paper record. RCFC 52.1; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The Court will then determine whether a party has met its burden of proof based on the evidence in that record. *Bannum*, 404 F.3d at 1355.

To succeed on a claim that an agency's decision violates a statute, regulation, or procedure, the protestor must show that such alleged violation was "clear and prejudicial." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). In reviewing a protestor's claims, the Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974); *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)) (Where the Court "finds a reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."). Accordingly, the Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2004) (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

This Court reviews bid protests in accordance with the standards set forth in the Administrative Procedure Act ("APA"). 5 U.S.C. § 706 (2018); *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (citing *Impresa*, 238 F.3d at 1332). Agency procurement actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4). That highly deferential standard exists in large part because agencies, and contracting officers in particular, are "entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *See Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa*, 238 F.3d at 1332); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

8

### III. Discussion

#### A. Jurisdiction

As an initial matter, defendant reiterates its jurisdictional arguments in its Cross-Motion for Judgment on the Administrative Record. *See generally* Def.'s CMJAR. Specifically, defendant states that "[b]ecause the PACOM protest was subsequently filed and consolidated into the instant case, the Government respectfully moves to dismiss the PACOM portion of this protest" for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. *Id.* at 16. While defendant notes that it is "cognizant of the Court's September 24, 2019" ruling on dismissal, it "respectfully disagree[s]." *Id.* In reiterating its jurisdictional arguments, defendant contends that plaintiff's Complaint is barred by FASA, as "FASA provides that a 'protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order.'" *Id.* (quoting 10 U.S.C. § 2304c(e)(1)). The Court finds that such an argument fails.

Though the Court already determined that it has jurisdiction over plaintiff's claims, *PAE-Parsons*, 145 Fed. Cl. 194, the Court finds it prudent to elaborate on its initial holding. In this procurement, the Agency ultimately awarded four Multiple Award Task Order Contracts pursuant to the award scheme contemplated in the Solicitation. *See, e.g.*, AR 289048. A "task order contract" is defined as "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." 10 U.S.C. § 2304d(1). Federal Acquisition Regulation 16.501-2(a) explains that, "[p]ursuant to 10 U.S.C. 2304d and 41 U.S.C. 4101, requirements contracts and indefinite-quantity contracts are also known as delivery-order contracts or task-order contracts." Thus, a task order contract "may take the form of . . . indefinite-quantity (IDIQ) contracts" based on FAR Part 16.5. JOHN CIBINIC, JR., RALPH C. NASH JR. & CHRISTOPHER R. YUKINS, FORMATION OF GOVERNMENT CONTRACTS 327 (4th ed. 2011). FAR 52.216-27 further provides that these types of contracts can be either single award or multiple award contracts,[4] such as the Multiple Award Task Order Contracts at issue in this procurement. It is undisputed that this Court has jurisdiction over the "award of a contract or any alleged violation of statute or regulation in connection with a procurement" pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1). Given the language of the Tucker Act and this Court's routine exercise of jurisdiction over protests contesting IDIQ contract awards, the Court once again concludes that the FASA jurisdictional bar does not apply to the case at bar. *See* 28 U.S.C. § 1491(b)(1); 10 U.S.C. § 2304d(1); 10 U.S.C. § 2304c(e); *see, e.g.*, *Tele-Consultants, Inc. v. United States*, 142 Fed. Cl. 686 (2019) (resolving a protest challenging an agency's IDIQ contract awards); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359–60, 1362 (Fed. Cir. 2009) (acknowledging that the Tucker Act confers on this Court jurisdiction over bid protests concerning Multiple Award Task Order Contracts).

---

4    FAR 52.216-27, titled Single or Multiple Awards, provides the following:

> The Government may elect to award a single delivery order contract or task order contract or to award multiple delivery order contracts or task order contracts for the same or similar supplies or services to two or more sources under this solicitation.

Moreover, as more fully explained below, the Court's careful review of the legislative history of FASA, the full text of 10 U.S.C. § 2304c, and the Administrative Record confirms that the FASA bar does not apply.

Congress specifically tailored FASA to ensure that its "objectives would be accomplished *without undermining the key features of the current procurement statutes, such as full and open competition and an effective bid protest process, that have been established over the years to safeguard the acquisition system and prevent abuse*." S. REP. NO. 103-258, at 3 (1994) (emphasis added). Anticipating that agencies might attempt to abuse FASA's jurisdictional bar, Congress further cautioned that task order contracts "must be structured carefully *to ensure that they are not abused to avoid competition* and funnel money to favored contractors." 140 CONG. REC. 12369 (1994) (emphasis added). Accordingly, the courts have interpreted FASA to mean that "once the task or delivery order contract itself has been obtained through full and open competition, orders made pursuant to that contract are immune from [the Competition in Contracting Act]'s full and open competition requirement." *Glob. Comput. Enter. v. United States*, 88 Fed. Cl. 350, 414 (2009) (quoting *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 16 (D.D.C. 2001)). That interpretation and the Court's conclusion that task order contracts are different from pure task orders is bolstered by the language of 10 U.S.C. § 2304c(a), which semantically crystalizes the distinction between a task order contract and a task order awarded under that contract as follows: "[t]he following actions are not required for issuance of a task or delivery order *under a task or* delivery order contract." (emphasis added). Additionally, the language in § 2304c(e)—the FASA bar—specifically focuses on task orders as opposed to task order contracts, as it states that "[a] protest is not authorized in connection with the issuance or proposed issuance of a *task or delivery order* except for . . ." (emphasis added). Thus, should the Court permit the Agency to entirely avoid judicial review of its contract awards by intentionally linking the task order awards to the task order contracts at issue, such a decision would directly violate the distinctions drawn in 10 U.S.C. § 2304a between task order contracts and task order awards as well as Congress's clearly documented intent to prevent such a result from occurring. *See, e.g.*, 140 CONG. REC. 12369 (1994).

Additionally, the Administrative Record reveals that the IDIQ contract and the "orders made pursuant to that contract" were obtained through the exact same procurement vessel. *See* AR 2624; *see also Glob. Comput.*, 88 Fed. Cl. at 414. If the Court were to extend the FASA bar to this procurement simply because the IDIQ contract and the task orders were simultaneously awarded, it would effectively be "*undermining the key features of the current procurement statutes, such as full and open competition*," in direct contravention of the legislative intent behind FASA. *See* S. REP. NO. 103-258, at 3 (emphasis added). Such an application of FASA would create a loophole in which an agency could award underlying IDIQ contracts that were judicially impregnable, effectively obliterating the requirement that contracts be awarded through free and open competition and breeding agency abuse of procurement law and regulation.

Finally, the Court's review of the Administrative Record likewise confirms that the FASA bar does not apply. The Solicitation stipulated that the Agency would award a minimum of four and up to six IDIQ contract awards that cover the six COCOMs and Afghanistan. AR 2511–12. The Agency deliberately made award determinations for each of the COCOM regions

10

in descending order of priority, beginning with EUCOM and ending with SOUTHCOM. *See id.* The six COCOMs could have been awarded to six *different* offerors, each with a different minimum dollar guarantee. *See id.* Therefore, each COCOM "task order" could have been an offeror's first IDIQ contract award. Such a scheme clearly indicates both that the IDIQ awards were so intrinsically linked with the task order awards as to be practically a single award, and that the Army functionally issued *separate and distinctly different* IDIQ contract awards.

This conclusion is further bolstered by language in the Solicitation itself, which dictates that the "minimum guarantee for each LOGCAP V contract is the **base year of the setting the theater requirement** . . . [for] *each* [COCOM]." AR 2512 (emphases added). As the setting the theater task orders provide the *entire* value for the IDIQ contracts, bifurcating the task orders from the contracts would result in contracts with no consideration. As a contract cannot exist without consideration, and as the value of the setting the theater task order provides the *only* consideration for the contracts at issue, clearly the task orders and the contracts are one and the same. *See Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009) (quoting *Trauma Servs. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997)) ("A party alleging either an express or implied-in-fact contract with the government 'must show a mutual intent to contract including an offer, an acceptance, and consideration.'"); *see also* AR 2512. Therefore, any offeror protesting the outcome of this procurement is necessarily protesting the contract itself, not simply a task order.

In addition to its jurisdictional arguments, defendant also renews its arguments related to standing. *See generally* Def.'s CMJAR. Specifically, defendant contends that "the Court must still dismiss P2GLS's complaint because, as a fellow LOGCAP V IDIQ contract awardee, P2GLS is not an interested party with standing to challenge Vectrus's IDIQ contract." *Id.* at 17 (citations omitted). The Court turns again to its prior decision in *PAE-Parsons*, which held that, as a disappointed bidder, P2GLS has standing to bring this protest based on the Agency's unique award scheme. 145 Fed. Cl. at 200.

This Court has previously held that "status as a contract awardee does not by itself deprive this court of bid protest jurisdiction." *Nat'l Air Cargo Grp., Inc. v. United States*, 126 Fed. Cl. 281, 295 (2016); *cf. Sys. Appl. & Techs. Inc. v. United States*, 691 F.3d 1374, 1381–82 (Fed. Cir. 2012). As the Court stated in its earlier opinion in *PAE-Parsons*, "[t]he nature of this Solicitation essentially resulted in four concurrently awarded—but very different—IDIQ contracts." 145 Fed. Cl. at 200. The Court's determination that these awards were separate and distinct is only bolstered by the fact that each IDIQ contract had a different minimum guarantee, which directly reflected the base year of the setting the theater requirement for the COCOM region an awardee received. *See* AR 2512. Thus, the "task orders were so intrinsically linked to the IDIQ awards as to be indistinguishable from the IDIQ contract awards themselves." *PAE-Parsons*, 145 Fed. Cl. at 200. Therefore, each awardee's resulting IDIQ contract was clearly different than any other offeror's award such that each offeror, regardless of whether it is an awardee, has a demonstrable "direct economic interest . . . affected by the award of the contract." *See Weeks Marine, Inc.*, 575 F.3d at 1359 (citing *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Accordingly, plaintiff has adequately demonstrated it is a disappointed bidder with respect to both the AFRICOM and PACOM awards.

11

### B. Labor Staffing Model

In its Motion for Judgment on the Administrative Record, plaintiff alleges that the Army did not evaluate P2GLS's proposal consistent with the Solicitation's requirements for analyzing the Technical/Management Factor. Pl.'s MJAR at 23. Specifically, plaintiff argues that the Army deviated from the Technical/Management Factor criteria set forth in the Solicitation by assigning P2GLS an elevated risk description, despite not explicitly assessing any weaknesses. *Id.* at 9. Plaintiff further contends that, because no weakness was assigned by the Technical/Management Evaluation Team ("TMET") or the SSAC, the SSA erred in assigning "a risk rating of anything higher than 'Low.'" *Id.* at 13. But for the allegedly erroneous "moderate" risk description, plaintiff argues that it would have received an "Outstanding" adjectival rating for the Technical/Management Factor, putting it on equal footing with Fluor and Vectrus for the AFRICOM and PACOM awards. *Id.* at 15, 18. Finally, plaintiff asserts that "nothing in the evaluation record justifies or supports the risk rating." *Id.* at 14 (emphasis omitted). In promulgating its arguments, plaintiff contends that "[w]here an evaluation record is devoid of any explanation for its evaluation ratings or action, an agency's award decision must be set aside." *Id.* While plaintiff correctly cites the standard for setting aside an award decision, the Court does not believe the awards need to be set aside.

In response, the Army contends that P2GLS's claim is predicated on the false premise that "the Army's rating of 'Good' in the Technical/Management factor was entirely predicated upon its risk assessment of P2GLS's staffing model." Def.'s CMJAR at 20. Defendant further argues that, while the Solicitation provided for risk descriptions, those descriptions were not ratings, but, rather, were used in "furtherance of [the Army's] analysis in assigning the overall Technical/Management factor." *Id.* at 21 (citing AR 2627).

In analyzing whether the Agency's award decision should be set aside, the Court looks to whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *FFL Pro LLC v. United States*, 124 Fed. Cl. 536, 551 (2015) (citing *Impresa*, 238 F.3d at 1332–33). Under the Solicitation in the case at bar, offerors did not receive risk ratings, but rather, they received adjectival ratings for each factor based upon "the degree to which the proposed approach meets or does not meet the requirements as identified under each factor through an assessment of the strengths, weaknesses, deficiencies, and risks." AR 2624. Therefore, whether the contract should be set aside turns on whether the Army sufficiently explained its reasoning in making awards. 48 C.F.R. § 15.306.

The TMET determined that P2GLS's final proposed LSM "use[d] a logical and systematic approach for each of the requirements identified in the RFP" with "an explanation of sources and estimating calculations used for determining its labor staffing performance factors." AR 68494. The TMET further explained that plaintiff's proposal provided "a labor staffing model and resulting approach that is consistent, scalable and adjustable across the broad range of requirements identified in the RFP." *Id.* However, the TMET also expressed concern over plaintiff's proposal because P2GLS made subjective adjustments to performance factors, which the TMET believed would limit "the ability to employ effective measures to control cost and ensure costs can be traceable to execution." *Id.* Despite this, the TMET ultimately rated

12

plaintiff's Technical/Management Factor as "Good" for both the AFRICOM and PACOM regions. AR 68496 (PACOM), 68498 (AFRICOM).

Plaintiff further posits that, because it was only assigned a "Good" adjectival rating, the Army necessarily assessed plaintiff a significant weakness, which inflated its "risk rating" from "Low" to "Moderate." Pl.'s MJAR at 11. The Court does not agree with plaintiff's understanding. The TMET consistently described P2GLS's Technical/Management approach using descriptive language for a "Good" rating. AR 68495–98. Moreover, the TMET consistently described P2GLS's Technical/Management Factor in each COCOM as containing "a thorough approach and understanding of the requirements." *See generally* AR 68495–98. Additionally, the TMET described each of Vectrus and Fluor's Technical/Management approaches as having an "exceptional approach and understanding of the requirements," consistent with the language for an "Outstanding" rating. AR 2627; *see* AR 68571–76 (Vectrus); *see also* AR 68441–46 (Fluor).

The SSAC relied upon the TMET's aforementioned Technical/Management evaluations rated Fluor and Vectrus as "Outstanding" and P2GLS as "Good." AR 70315–16. For AFRICOM, the SSAC recommended P2GLS for award as it was the lower priced option and simultaneously recognized that P2GLS's Technical/Management proposal "was inferior to that of Fluor." AR 70476. For PACOM, the SSAC recommended Vectrus and determined that P2GLS's Technical/Management proposal was inferior to that of Vectrus. AR 70472–73. After reviewing the evaluations, the SSA accepted the SSAC's recommendation to award the PACOM region to Vectrus. AR 70620. However, the SSA rejected the SSAC's recommendation for AFRICOM, and instead determined that the strengths in Fluor's LSM warranted its selection over P2GLS's lower priced offer. AR 70627. Moreover, as the language for a "Good" adjectival rating encompasses a "low to moderate" risk, an offer that is determined to be low-risk may still be reasonably assessed a "Good" rating if the proposal aligns more readily with the "Good" descriptors of its proposals understanding of the solicitation. In light of the holistic approach to and full explanation for the Agency's Technical/Management evaluations, the Court finds that the Army sufficiently explained its award decision. As such, the Court will not set aside the Agency's contract awards to Fluor and Vectrus as neither award was arbitrary nor capricious.

### C. Strengths and Weaknesses

In addition to its arguments related to the LSM adjectival ratings, plaintiff contends that, in not receiving a strength for traceability, its LSM received a "*de facto* significant weakness" that the Agency did not address through discussions. Pl.'s MJAR at 19–20. As a result, plaintiff contends that discussions were misleading and not meaningful. *Id.* at 21. In response, defendant argues that merely "[s]aying that another offeror provided a superior proposal is not the same as saying P2GLS's proposal contained a significant weakness." Def.'s CMJAR at 24. The Court agrees with defendant's understanding. The mere absence of a strength does not constitute a *de facto* weakness.

The FAR states that the "scope and extent of discussions are a matter of contracting officer judgment." 48 C.F.R. § 15.306(d). This Court has expanded on this premise by stating

that "the contracting officer 'is not required to discuss every area where the proposal could be improved,'" and that a "contracting officer has considerable discretion regarding the contents of the discussions." *IBM Corp., U.S. Fed. v. United States*, 101 Fed. Cl. 746, 764 (2011) (citing 48 C.F.R. § 15.306(d)(3)). For the Agency to hold meaningful discussions, a contracting officer must "[a]t a minimum . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." 48 C.F.R. § 15.306(d)(3); *see also Precision Asset Mgmt. Corp. v. United States*, 135 Fed. Cl. 342, 352 (2017). However, as defendant points out, "the contracting officer is not required to discuss every area where the proposal could be improved." Def.'s CMJAR at 26 (quoting 48 C.F.R. § 15.306(d)(3)).

As this Court has previously held, the meaningful discussion requirement "does not mean that an agency must 'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal." *WorldTravelService. v. United States*, 49 Fed. Cl. 431, 439–40 (2001) (citations omitted). Discussions are only misleading if they "misdirect the protestor as it revises its proposal," or if they consist of "communications from the government that are incorrect, confusing[,] or ambiguous." *D&S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 40 (2011) (quoting *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 670 (2010)). While an agency may not favor one offeror over another pursuant to FAR 15.306(e)(1), "agencies are not required to conduct identical discussions with each offeror." *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 735 (2008); *see also DMS*, 90 Fed. Cl. at 672. Rather, "the procuring agency should tailor discussions to each offeror's proposal." *DMS*, 90 Fed. Cl. at 672 (citing *WorldTravelService*, 49 Fed. Cl. at 440).

Plaintiff's position that the Army considered traceability in P2GLS's LSM to be a weakness without proper discussions is incorrect. As previously stated, the Army did not assign an elevated risk rating to P2GLS's LSM or explicitly assess a significant weakness or deficiency in P2GLS's Technical/Management evaluation. AR 68494. As the Army did not assess P2GLS a significant weakness or deficiency, the Agency was not required to raise such issues during discussions. *See* 48 C.F.R. § 15.306(d)(3). P2GLS was included in the competitive range and participated in multiple rounds of discussions. *See* AR 70612. Of the over 100 Evaluation Notices P2GLS received during discussions, more than forty concerned clarifications, significant weaknesses, weaknesses, and deficiencies in P2GLS's Technical/Management volume, none of which related to P2GLS's LSM traceability. *See generally* AR 70874–94. As P2GLS did not receive a weakness for its traceability, and as a failure to receive a strength does not amount to a *de facto* weakness, the Army did not err in failing to discuss traceability with P2GLS.

### D. Award Decisions

Finally, plaintiff argues that the SSA's award of the AFRICOM and PACOM regions was arbitrary and capricious because the SSA placed an inordinate amount of weight on offerors' LSMs. Pl.'s MJAR at 30. Plaintiff expands on this by stating that the best value determination was flawed, as the SSA "ignor[ed] nearly every other evaluation factor" and "reject[ed] the SSAC's award recommendation without explanation." *Id.* at 5. Plaintiff highlights that the SSAC recommended P2GLS for AFRICOM. *Id.* at 31 (citing AR 70627). Plaintiff specifically alleges that "the SSA failed to adequately document the basis for [her] rejection of the SSAC's

14

recommended award to P2GLS." *Id.* at 30. In response, defendant contends that plaintiff's argument "amounts to nothing more than a disagreement with the SSA's ultimate decision." Def.'s CMJAR at 36.

The record shows that the SSAC recommended awarding AFRICOM to P2GLS because "P2GLS had the highest rated proposal based on an integrated assessment of the RFP's stated evaluation criteria." AR 70476. The SSAC stated that "[i]n all comparisons and tradeoff scenarios, P2GLS appeared to be the best value and award recommendation of the SSAC for the AFRICOM decision." *Id.* The SSA did not agree with the SSAC's assessment, however, and stated that "[g]iven the relative importance of evaluation factors, I find Fluor's proposal to be superior to P2GLS'[s] proposal and the best value." AR 70629. The SSA further noted a strength in Fluor's proposal that was absent in P2GLS's, affording Fluor's LSM an added level of predictability, which the SSA determined justified the payment of an 8.47% premium. *Id.*

As this Court has previously held, "[a]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." *Am. Gen., LLC v. United States*, 115 Fed. Cl. 653, 696 (2014) (citing *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003)). The Solicitation clearly ranks the importance of evaluation factors and states that the Technical/Management Factor is the most important. AR 2624. In issuing contract awards, the SSA is not bound by the SSAC's findings, as the "SSA is required to exercise 'independent judgment' in making a source selection decision." *Coastal Int'l Sec., Inc. v. United States*, 93 Fed. Cl. 502, 536 (2010) (citing FAR 15.308)); 48 C.F.R. 15.308 ("While the [SSA] may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment."). FAR 15.308 further states that

> [t]he source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

Weighing the merits of each proposal against one another, the SSA specifically found that "[g]iven the relative importance of the evaluation factors, the strength in Fluor's Technical/Management Factor[] justifies payment of the $11M (8.47%) premium." AR 70629. As the SSA clearly explained her reasons for making the awards, it seems clear to the Court that the SSA exercised her independent judgment in awarding AFRICOM to Fluor and PACOM to Vectrus. As the SSA's award decision was neither "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the Court cannot set the award aside. *See Banknote*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (quoting *Advanced Data*, 216 F.3d at 1057).

### E. Injunctive Relief and Corrective Action

In addition to its merits-based arguments, plaintiff asserts that it is entitled to permanent injunctive relief. Pl.'s MJAR at 39. As plaintiff has not succeeded on the merits, injunctive relief is inappropriate, and no further analysis of the remaining factors is necessary. *See Mobile*

*Med. Int'l Corp. v. United States*, 95 Fed. Cl. 706, 742 (2010) ("[A] permanent injunction requires actual success on the merits.") (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)); *see also York Telecom Corp. v. United States*, 130 Fed. Cl. 186, 197–98 (2017) (citing *Nat'l Steel Car, Ltd. v. Can. Pac. Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004)) ("A plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon a motion for permanent injunctive relief."). Additionally, the Court does not believe that the terms of the Solicitation regarding the LSMs were ambiguous and finds that any argument suggesting that plaintiff was prejudiced by such an ambiguity has clearly been waived. *See generally Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).

Irrespective of the Court's findings in the instant action, on December 3, 2019, the Court held a status conference in all of the directly-related cases associated with the LOGCAP V procurement. Although defendant demonstrated success on the merits in the case at bar, the Court determined that issues with the Agency's price reasonableness analyses warranted corrective action. On December 17, 2019, the Court issued an Order staying and remanding the case to the Agency for a period of forty-five days—up to and including January 31, 2020—for the Agency to conduct corrective action. Order Remanding Case to Army, ECF No. 74. In that Order, the Court also directed the defendant to file a status report on or before February 7, 2020, "apprising this Court of the results of the Agency's corrective action and providing the Court with the Agency's new price reasonableness determinations." *Id.* at 2. In turn, the Court afforded the plaintiff seven days—up to and including February 14, 2020—to respond to defendant's Status Report. *Id.* at 2. On February 5, 2020, defendant filed a status report regarding that corrective action, along with over 1,000 pages of supporting documentation. *See* Defendant's Status Report Regarding Corrective Action, ECF No. 75; *see also* Associated Documents, ECF No. 76. Plaintiff responded to defendant's Status Report on February 14, 2020, stating that "[t]he analysis undertaken by the Army . . . has no bearing upon the issues P2GLS raised in its protests," and renewing its request "that the Court grant P2GLS' Motion for Judgment on the Administrative Record." Plaintiff PAE-Parsons Global Logistics Services, LLC's Response to Defendant's Status Report Regarding Corrective Action, ECF No. 77 at 1. As corrective action is now complete and plaintiff failed to raise new issues that would require additional review by the Court, the Court issues this Opinion.

### IV.   Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is **DENIED**. Defendant and defendant-intervenors' CROSS-MOTIONS for Judgment on the Administrative Record are **GRANTED**. The Clerk is directed to enter judgment in favor of defendant and defendant-intervenors, consistent with this Opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*
Loren A. Smith,
Senior Judge